554 A.2d 458

William R. STARK

v.

COMPTROLLER OF the TREASURY.

No. 856, Sept. Term, 1988.

Court of Special Appeals of Maryland.

March 9, 1989.

---

L. Paige Marvel (Venable, Baetjer and Howard, on the brief) Baltimore, for appellant.

Gerald Langbaum, Asst. Atty. Gen., Annapolis (J. Joseph Curran, Jr., Atty. Gen., Baltimore and John K. Barry, Asst. Atty. Gen., Annapolis, on the brief), for appellee.

Argued before GILBERT, C.J., and WILNER and ROBERT M. BELL, JJ.

WILNER, Judge.

Appellant won $1,000,000 on the Maryland lottery. He is not complaining about that. What irks him, and has led to this appeal, is the Comptroller's attempt to tax him on $950,000 of his winnings.

Appellant is, and at all times relevant to this case has been, a resident of the State of Washington. In December of 1976, he received a lottery subscription issued by the Maryland State Lottery Agency which gave him the right to participate in the drawings of the Maryland Lottery during January, 1977. How and where he received his subscription is not revealed to us. In any event, on January 27, 1977, fortune struck.

The million dollar prize won by appellant is to be paid in 20 equal annual installments of $50,000. The State Lottery Agency made the first payment directly to appellant, by check, on January 28, 1977. The remaining 19 payments have been, and will continue to be, paid through an annuity purchased by the Agency for the benefit of appellant from the Prudential Insurance Company of America (Prudential), a New Jersey corporation. That annuity was created pursuant to a group annuity contract entered into in November, 1976, between the Agency and Prudential. Section 1.1(a) of that contract provides, in relevant part:

"Whenever an annuity is to be provided under this contract with respect to a person who becomes eligible to receive periodic payments as a result of a Maryland State Lottery Agency drawing, a notice to effect an annuity with respect to such person will ... be given to the Prudential by the Contract–Holder. Any such notice will specify the amount of annuity to be effected, the date annuity payments are to commence, and such information about the person with respect to whom the annuity is to be effected as may be required by the Prudential. (A person for whom an annuity is effected under this contract is referred to as an 'Annuitant'.) A contribution equal to the amount determined from the schedule of annuity purchase rates then in effect under the contract

needed to effect such annuity will accompany such notice and will be applied to effect an annuity on the day following its receipt by the Prudential."

Although the group contract allowed the parties—i.e., the State Lottery Agency and Prudential—to make changes in the contract, § 2.1 made clear that "no such change will adversely affect the rights of any person with respect to any annuity effected before the effective date of such change."

In anticipation that someone would win the January 27 drawing, the Agency, on January 25, 1977, sent Prudential a check for $487,575.60, the cost established pursuant to the group contract for the annuity to be issued in regard to that drawing. At the time, of course, the Agency did not, and could not, know who the winner would be; indeed, the remittance slip accompanying the Agency's check states that "[t]he winner and beneficiary information will be forwarded for the winner of the Millionaire Drawing to be held January 27, 1977." The check was received by Prudential on the 27th, the date of the drawing. This remittance, apparently, served as notice to effect an annuity for the winner.

At some point, the Lottery Agency sent the necessary information to Prudential, for, on February 1, 1977, Prudential issued an annuity to appellant. The certificate issued to appellant identified the Group Annuity Contract by number and the State Lottery Agency as the Contract–Holder. It provided for 19 annual payments of $50,000 each, commencing January 15, 1978, stating, as to them, "All payments described in this certificate are payable at the Home Office of Prudential. All payments and the conditions governing them are subject in every respect to the terms of the group annuity contract."

At the time of the drawing, Maryland did not expressly tax the lottery winnings of nonresidents. Md.Ann.Code art. 81, § 287 then taxed a nonresident only "on that portion of his federal adjusted gross income as is derived from tangi-

ble property ... permanently located in this State ... and income from business, trade, profession or occupation carried on in this State...." By 1977 Md.Laws, ch. 414, however, the Legislature added to that list "and income from State lottery prizes," intending by that to "requir[e] nonresidents to pay income taxes on State Lottery prizes." Chapter 414, by its terms, took effect July 1, 1977.

In March, 1978, appellant wrote to the Comptroller inquiring about the tax status of his winnings. A "Revenue Specialist" responded on April 4, 1978, informing him of the 1977 enactment but advising that "[s]ince your winnings were prior to [July 1, 1977], you are not subject to the Maryland tax on your lottery winnings, and will not be required to file a Maryland return." Heeding that welcome advice, appellant did not file any Maryland income tax returns.

In September, 1985, a different "Revenue Agent" for the Comptroller, as part of a "compliance survey," discovered that appellant had won the lottery in 1977 and had not been filing tax returns. The agent, Mr. Gutin, sent appellant blank tax return forms for the years 1977–84 and requested that they be "completed, signed and returned to me with payment within thirty (30) days." In response to an inquiry from appellant, Mr. Gutin further informed him that "[p]rizes received after June 30, 1977 are subject to taxation. The tax year 1977 would be exempt in your situation."

Dutifully, appellant filed the Maryland tax returns for the years 1978–84 and paid the taxes due on what he received in those years—taxes in excess of $15,000. Still, Mr. Gutin was not satisfied. On November 25, 1985, he sent appellant a bill for $6,540 in interest, having apparently threatened him by telephone with penalties as well. This produced a rather intemperate letter from an attorney in Seattle, Washington. Asserting that the collection was "illegal" and the result of "unnecessary overreaching of the Comptroller's Office," and accusing Mr. Gutin of "unnecessarily intimidating non-residents," the lawyer demanded the "return of

those funds immediately." The Comptroller's office responded by (1) treating that letter as a request for refund, (2) denying the request, and (3) assessing not only the interest but $1,501 in penalties as well.

On appellant's petition, the issue was presented to the Maryland Tax Court which, on July 29, 1987, abated the penalties but otherwise affirmed the denial of appellant's claim for refund. The Circuit Court for Baltimore City affirmed the Tax Court decision and now the case comes to us laced with both statutory and Constitutional issues.

Most of the issues and sub-issues raised by appellant rest on the assumption, or assertion, that the money he has received and will continue to receive from the Prudential annuity does not constitute income "from State lottery prizes." His view is that the State fully discharged its obligation to him in January/February, 1978, when it paid him the first installment and created the annuity. Whatever income he earned "from State lottery prizes" he claims to have earned as of then—prior to the enactment and effective date of Chapter 414. The money he now receives, he contends, is from the annuity, not the lottery, and as that money comes directly to him in Washington from the New Jersey office of Prudential and never is present in Maryland, Maryland cannot tax it. As an alternative, appellant argues that application of Chapter 414 to the money he receives from the annuity would constitute an unlawful impairment of the obligation of the State's contract.

Appellant's arguments are well articulated and forcefully presented, but we do not find them persuasive, and so we shall affirm.

### (1) Standard of Review

The underlying facts in this case were stipulated. There is no real dispute as to when appellant won the lottery, how much he won, or how his prize is to be paid. The tax statute is clear, as are the terms of the two Prudential contracts—the group annuity contract with the State Lottery Agency and the specific annuity issued pursuant to

that contract to appellant. Aside from the "impairment of contract" question, which is obviously one of law, the case really comes down to whether the periodic payments appellant receives from the annuity can legitimately be regarded as income earned after July 1, 1977 "from State lottery prizes." That too we think is a question of law. It involves neither agency expertise nor basic fact-finding. The issue, then, is whether the Tax Court was right or wrong in concluding that the periodic payments to appellant constitute taxable earnings from a State lottery prize. *See* Md. Tax–Gen.Code Ann. § 13–532 and Md.State Gov't Code Ann. § 10–215(g); *compare* former Md.Ann.Code art. 81, § 229(*o* ); *but see* Revisor's Note to Md.Tax–Gen.Code Ann. § 13–532.

### (2) *Background*

Almost at the very inception of its operations in 1973, the State Lottery Agency made two basic policy decisions regarding the large, million-dollar type, prizes: (1) to pay them in installments over a period of years rather than in a lump sum and (2) to fund its multi-year obligation through an insurance mechanism.

The first of these decisions was reflected in the initial regulations adopted by the Agency in March, 1973. Regulation 21.b. directed the Lottery Commission to "adopt a prize structure for all types of lotteries administered by it." Regulation 29 specifically looked to annual installment payments. It provided:

"All prizes shall be paid within a reasonable time after they are awarded and after the claims are verified by the Director. The date of the first installment payment of each prize requiring annual payments shall be the commencement date of the payments and a payment shall be made on the anniversary date of said payment thereafter in accordance with the type of prize awarded. The Director may, at any time, delay any payment in order to review a change of circumstances relative to the prize awarded, the payee, the claim, or any other matter that may have come to his attention. All delayed payments

will be brought up to date immediately upon the Director's confirmation and continue to be paid on each original anniversary date thereafter."

That Regulation has remained more or less intact since its initial adoption. It now appears as Md.Admin.Code tit. 14, § 01.03.01G.

The timing of the Agency's decision to fund its long-term obligation through the purchase of annuities is not so well documented, although at least by May of 1976 the Director of the Agency confirmed to the Attorney General that the large "prizes offered by the State Lottery Agency are paid over a period of years via an annuity policy purchased by the Agency for the benefit of the prize winner...." 61 Op.Att'y Gen. 541 (1976).[1]

The mutual advantage of both of those decisions would seem to be self-evident. The multi-year payout reduced the cost of the prize to the Agency by nearly 50%; in light of the Federal income tax rates then prevailing, it also saved the recipient from a catastrophic tax consequence, which enured not only to his immediate benefit but also, by making the prizes more attractive, to the Agency's as well. The multi-year payout created a long-term obligation for the Agency, however, which, if unfunded, could be troubling. The State Lottery was created as a revenue source for the State; a major share of the Agency's earnings goes to the State and is counted as part of the revenue needed to create the Constitutionally-mandated balanced budget. *See* Md. Const. art. III, § 52. Any shortfall in future years could well jeopardize the State's share of the Agency's earnings. *See* Attorney General Opinion No. 84–201 (Sept. 5, 1984) (Unpublished), included as an Exhibit to Joint Committee on the Management of Public Funds Report to the General Assembly, Interim (1984). Even the uncertainty as to

---

1. In that Opinion, the Attorney General determined that "[t]he Lottery Agency has the authority to pay prizes in installments and nothing in the Lottery law would prohibit it from making those payments via annuity." 61 Op.Att'y Gen. at 546 n. 2.

whether a shortfall *might* exist in any given year could create significant problems in the overall budgeting process.

In order to implement these two decisions, the Agency initially turned to the purchase of annuities from insurance companies, entering into one-year contracts that were competitively bid. The parties stipulated as much with respect to the Prudential contract. *See also* Joint Committee Report, *supra,* at 7–9. In 1984, the Joint Committee recommended that the Agency discontinue that mechanism, in part because of a concern expressed by the Attorney General that the Agency's liability to the winner was *not* discharged by the annuity and that, if the insurance company should become insolvent or fail to pay the annuity, the winner would likely have a claim upon the State's share of the State Lottery Fund. In place of these private annuities, the Joint Committee recommended, and the Lottery Agency now uses, Zero Coupon Treasury bonds or other comparable types of treasury instruments to fund its multi-year obligations. *See* Exhibit D to Joint Committee Report, *supra.*

### (3) *Nexus Between Maryland And The Annuity Payments*

Appellant's principal argument proceeds thusly: (1) as a matter of basic Constitutional law, "[w]here ... income is not derived from property or business within the state at the time the income is received, a non-resident is not, and constitutionally cannot, be liable for tax on that income"; (2) his entitlement to the periodic payments after 1977 is found solely in the Prudential annuity; (3) that entitlement is in the nature of a chose in action which, for tax purposes, has the same situs as his domicile; ergo (4) as that domicile, and thus the situs of his entitlement, is outside of Maryland, and as the payments he receives by virtue of his Washington-based entitlement are sent to him directly from New Jersey, they are beyond the reach of the Maryland tax collector.

There are two answers to this argument: first, the Constitutional constraint on the State's taxing power is not quite so stringent as appellant urges; and, second, the underlying premise that the periodic payments he receives derive exclusively from the annuity and have no connection with the State of Maryland is, in our view, fallacious.

Some of the early cases cited by appellant do indeed suggest that a State's power to tax the income of nonresidents is limited to income deriving from property owned or business carried on within the State. *See, for example, Shaffer v. Carter*, 252 U.S. 37, 40 S.Ct. 221, 64 L.Ed. 445 (1920); *Wood v. Tawes*, 181 Md. 155, 161, 28 A.2d 850 (1942), *cert. denied* 318 U.S. 788, 63 S.Ct. 982, 87 L.Ed. 1154 (1943). Other cases, however, have suggested a broader standard or at least have allowed some flexibility in applying that standard.

In *New York ex rel. Whitney v. Graves*, 299 U.S. 366, 57 S.Ct. 237, 81 L.Ed. 285 (1937), the issue was whether New York could tax the profit made by a Massachusetts resident on "the sale of a right appurtenant to membership in the New York Stock Exchange." *Id.* at 369, 57 S.Ct. at 237. The "right" involved was the right to one-fourth of a new membership on the Exchange that Mr. Whitney acquired by virtue of his existing membership on the Exchange. He sold that right and New York attempted to tax his profit on the sale. In protesting the tax, Whitney pointed out that he was domiciled in Massachusetts, that he never had an office or carried on any business in New York, and that he transacted no business directly on the Exchange but had all orders executed by other members of the Exchange who did have offices in New York. As appellant now argues with respect to his annuity, Mr. Whitney claimed that his membership in the Exchange was intangible personal property, that "property of that sort is taxable only at the domicile of the owner," and that, unless his membership had a "business situs" in New York, it could not be taxed there.

The Supreme Court rejected that argument. With particular reference to the "situs" claim, it observed, at 372, 57 S.Ct. at 238:

"When we speak of a 'business situs' of intangible property in the taxing State we are indulging in a metaphor. We express the idea of localization by virtue of the attributes of the intangible right in relation to the conduct of affairs at a particular place. The right may grow out of the actual transactions of a localized business or the right may be identified with a particular place because the exercise of the right is fixed exclusively or dominantly at that place. In the latter case the localization for the purpose of transacting business may constitute a business situs quite as clearly as the conduct of the business itself."

The "dominant attribute" of the property at issue, noted the Court, was the right to conduct business at the Exchange. That attribute, it held, "so links it to the situs of the Exchange as to localize it at that place and hence to bring it within the taxing power of New York." *Id.* at 374, 57 S.Ct. at 239.

As appellant points out, the *Graves* Court did view the intangible right at issue there as being "of a peculiar nature," which it certainly was, and we do not mean to suggest that appellant's annuity is, in all respects, equivalent to membership in the New York Stock Exchange. The important aspect of *Graves* is the Court's conclusion that intangible personal property can, in some circumstances, have a situs for State tax purposes in a place other than its owner's domicile and that a reviewing court is obliged to look at the circumstances to determine whether the right or property at issue may also be of "a peculiar nature" having a "localization" within the taxing State.

The same general principle was applied in *International Harvester Co. v. Wisconsin Department of Taxation*, 322 U.S. 435, 64 S.Ct. 1060, 88 L.Ed. 1373 (1944), where the Court sustained a Wisconsin tax on dividends received by nonresident shareholders of a nonresident corporation mea-

sured by the proportion of those dividends derived from corporate earnings in Wisconsin. Although there had initially been some doubt about the matter, it became clear and was accepted by the Court that this was not a tax on the corporation or on the corporate earnings but on the income of the nonresident stockholders. As a basis for its conclusion that Wisconsin could impose such a tax, the Court held at 441–42, 64 S.Ct. at 1063–64:

"A state may tax such part of the income of a non-resident as is fairly attributable either to property located in the state *or to events or transactions which, occurring there, are subject to state regulation and which are within the protection of the state and entitled to the numerous other benefits which it confers*.... And the privilege of receiving dividends derived from corporate activities within the state can have no greater immunity than the privilege of receiving any other income from sources located there."

(Emphasis added.) *See also Kulick v. Department of Revenue,* 290 Or. 507, 624 P.2d 93, *appeal dismissed* 454 U.S. 803, 102 S.Ct. 76, 70 L.Ed.2d 73 (1981).

In *Miller Bros. Co. v. Maryland,* 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744 (1954), though striking down an extended application of the Maryland use tax, the Court noted that "visible territorial boundaries do not always establish the limits of a state's taxing power or jurisdiction" and held that:

"If there is some jurisdictional fact or event to serve as a conductor, the reach of the state's taxing power may be carried to objects of taxation beyond its borders. When it has the taxpayer within its power or jurisdiction, it may sometimes, through him, reach his extraterritorial income or transactions. On the other hand, if it has jurisdiction of his taxable property or transactions, it may sometimes, through these, reach the nonresident."

*Id.* at 342, 343, 74 S.Ct. at 537, 538.

■ These cases make clear that a State may tax a nonresident not just on income earned from property in the

State or a business carried on in the State but also from "events" or "transactions" occurring in the State, or from intangible property having a special "localization" within the State. The domicile of the recipient is not necessarily controlling.

In applying these principles, we look to the following facts:

(1) The annuity from which the payments at issue come is not a contract entered into between two nonresident parties. It is, rather, a contract created and paid for by the State of Maryland pursuant to a general annuity contract made by *and in* the State of Maryland.

(2) The State of Maryland created and paid for that annuity contract because it had a separate contractual obligation to appellant.

(3) That separate contract was made, and was to be performed, in the State of Maryland. The drawing from which the contract arose was held in Maryland and was conducted by an agency of the State. The prize was awarded in Maryland.

(4) The contract required the State to pay to appellant $50,000 a year for 20 years. It did *not* call for the State to make any kind of lump sum payment to appellant and did not entitle appellant to receive any lump sum payment. The contract between the State and appellant called instead for installment payments over the 20–year period.

(5) The annuity was nothing more or less than the mechanism chosen by the State agency to fund its contractual obligation to appellant. The State agency still apparently retains its contractual obligation to appellant and, should Prudential, for any reason, fail to make the annuity payments, appellant has made clear that he will look to the State or its agency for satisfaction.

On these facts, we agree with the Tax Court and the Circuit Court that a sufficient nexus with the State has been established. Appellant did not receive his full lottery prize in 1977. He received only $50,000 of that prize. The

payments that he has received since then from Prudential constitute merely an incremental discharge of the State's continuing obligation to him for the balance of the prize. They therefore *do* constitute "income from State lottery prizes" earned after July 1, 1977, and are directly traceable to an "event" or "transaction" that occurred in Maryland. *See also Katzenberg v. Comptroller,* 263 Md. 189, 282 A.2d 465 (1971); *Marco Assoc. v. Comptroller,* 265 Md. 669, 291 A.2d 489 (1972). Accordingly, we find no due process impediment to the taxation of payments made to appellant after July 1, 1977.

### (4) *Obligation Of Contract*

It is conceded that the relationship between appellant and the State of Maryland is a contractual one. *See* Md.State Gov't Code Ann. § 9–122(f). From this, appellant argues that, by imposing a tax on his prize after the lottery drawing occurred, Maryland has impaired its obligation of contract in violation of Article I, § 10 of the United States Constitution.

■ Appellant contends that "the taxation of [his] lottery winnings by the State was not within the legitimate expectations of either of the contracting parties." He argues that the express terms of the contract must be read contemporaneously with "State law pertaining to interpretation and enforcement of [the] contract" and posits that, since no law authorized the taxation of a nonresident's lottery winnings at the time the contract was formed, "[t]he non-taxability of the lottery winnings of non-residents ... must be considered as if it were expressly incorporated into the terms and obligations of the contract." The Supreme Court has held otherwise.

In *The North Missouri R.R. Co. v. Maguire,* 87 U.S. (20 Wall.) 46, 22 L.Ed. 287 (1873), a railroad company entered into a contract with the State of New York. Later, the State imposed an income tax on the railroad. In upholding the tax against a challenge by the railroad, the Supreme Court explained:

"[T]he taxing power of the State is never presumed to be relinquished and, consequently, ... it exists unless the intention to relinquish it is declared in clear and unambiguous terms....

Authorities from numerous sources are cited by the plaintiffs, but none of them show that a lawful tax on a new subject, or an increased tax on an old one, interferes with a contract or impairs its obligation, within the meaning of the Constitution, even though such taxation may affect particular contracts, as it may increase the debt of one person and lessen the security of another, or may impose additional burdens upon one class and release the burdens of another, still the tax must be paid unless prohibited by the Constitution, nor can it be said that it impairs the obligation of any existing contract in its true legal sense."

*Id.* 87 U.S. at 61. *See also New York Rapid Transit Corp. v. New York,* 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024 (1938).

As appellant points out, State law was silent as to the taxation of lottery winnings of nonresidents at the time the contract between appellant and Maryland was formed. Since, as *New York Rapid Transit* directs, the taxing power of the State is never presumed to be relinquished unless the intention to relinquish is expressly declared, we find that the Tax Court was correct in finding that "the taxation of [appellant's] lottery winnings by the State was within the legitimate expectations of the contracting parties."

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.