No. 96-600

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


JOHN W. SHARP and DARLENE M. SHARP,

Plaintiffs and Appellants,

v.

DEPARTMENT OF REVENUE OF THE STATE
OF MONTANA; and MICK ROBINSON, in his
capacity as DIRECTOR, DEPARTMENT OF
REVENUE OF THE STATE OF MONTANA,

Defendants and Respondents.


APPEAL FROM:   District Court of the First  Judicial District, In and for the County of
Lewis
and Clark, the Honorable Jeffrey M. Sherlock, Judge Presiding


COUNSEL OF RECORD:

For Appellants:

Brian Lilletvedt and John B. Kuhr, Bosh, Kuhr, Dugdale, Martin & Kaze,
Havre, Montana

Henry C. Breighaupt and Milo E. Ormseth, Stoel, Rives, Boley,
Jones & Grey, Portland, Oregon

For Respondents:

Deborah Harten-Moore, Department of Revenue, Helena, Montana



Submitted on Briefs: June 5, 1997

Decided: September 15, 1997
Filed:

_____

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

John W. Sharp and Darlene M. Sharp won $47,000,000 in the multi-state lottery game known as Lotto America. The Sharps appeal the judgment of the First Judicial District Court, Lewis and Clark County, that their annual lottery payments are subject to Montana state income tax despite their change of residence from Havre, Montana, to the State of Washington. We affirm.

We restate the issue as whether the District Court erred when it ruled the Sharps' lottery proceeds are "income earned in Montana" within the meaning of 15-30-105, MCA, and are subject to Montana's state income tax.

The State of Montana is a member of the Multi-State Lottery Association (MSLA), an unincorporated government benefit association of state agencies and the District of Columbia, with central offices in Des Moines, Iowa. MSLA operates the multi-state lottery game formerly known as Lotto America. The money for all tickets purchased in the multi-state lottery is pooled. The winnings are paid from that pooled money and are administered for Montana lottery winners by the Montana Lottery Commission pursuant to 23-7-202, MCA. MSLA rules require that prizes of more than $250,000 must be paid annually in twenty equal payments.

The Sharps were Montana residents when they won the MSLA lottery in November 1991. They are to receive their winnings in twenty annual payments of $2,348,000 each. They reported the first payment of their lottery winnings on their 1991 Montana income tax form.

In August 1992, the Sharps moved to the State of Washington. They filed their 1992 Montana income tax return as part-year residents and did not report their 1992 lottery payment as Montana income because they received it after they moved to Washington.

After the Montana Department of Revenue (DOR) issued the Sharps assessments for income taxes due on their 1992 lottery payment, the Sharps filed objections to the assessments and then filed this action for declaratory judgment. They maintained that their annual lottery payments are in the nature of annuity payments and, as such, are not includable as taxable income in Montana.

The DOR moved to dismiss for failure to state a claim upon which relief can be granted. There being no dispute as to issues of fact, and with the consent of the parties, the District Court treated the motion as one for summary judgment. Noting that similar challenges to taxation of payments to nonresident lottery winners have been raised and rejected in other states, the District Court ruled that the Sharps' 1992 and subsequent

lottery winnings are taxable as income earned in Montana. The Sharps appeal.

## Discussion

Did the District Court err when it ruled the Sharps' lottery proceeds are "income earned in Montana" within the meaning of 15-30-105, MCA, and are subject to Montana's state income tax?

Section 15-30-105, MCA, provides that nonresidents of Montana are subject to Montana income tax based upon the ratio of income earned in Montana to total income. "Income earned in Montana" is not defined by statute.

The Sharps assert that 15-30-105, MCA (1991), applies here. That statute provided for a tax on the income of a nonresident "at the rates specified in 15-30-103 with respect to his entire net income as herein defined from all property owned and from every business, trade, profession, or occupation carried on in this state." It was amended in 1992 to provide for a tax on a nonresident's "income earned in Montana." The Sharps maintain that the purpose of the 1992 amendment to 15-30-105, MCA, was to change the method of calculating the income taxes due from nonresidents, not to change the existing source of income rules in determining the base for taxation of nonresidents. The Sharps further maintain that the applicable source of income rule is set forth at 15-30-131(1), MCA (1991). That statute provided:

In the case of a taxpayer other than a resident of this state, adjusted gross income includes the entire amount of adjusted gross income from sources within this state but shall not include income from annuities, interest on bank deposits, interest on bonds, notes, or other interest-bearing obligations, or dividends on stock of corporations except to the extent to which the same shall be a part of income from any business, trade, profession, or occupation carried on in this state.

The statute was amended in the July 1992 special session of the Montana Legislature to read, "In the case of a taxpayer other than a resident of this state, adjusted gross income includes the entire amount of adjusted gross income as provided for in 15-30-111." The amendment took effect for tax years beginning after December 31, 1991. Thus, it took effect before the Sharps became nonresidents of Montana.

The Sharps also cite the following Administrative Rule of Montana:

A nonresident's income from annuities . . . and all other income from intangible personal property is derived from or attributable to Montana sources only to the extent earned in connection with a business, trade, profession, or occupation carried on in Montana.

Rule 42.16.1113(1), ARM. This administrative rule was last amended in 1983.

The Sharps suggest that payments on an intangible are only taxable by the domicile of the owner. They argue that their right to collect lottery payments has all the legal characteristics of intangible personal property, in that the annual payments

are income from intangible contract rights and are in the nature of income from an annuity.

Based upon the above now-revised statutes and the corresponding administrative rule, the Sharps argue that in order for Montana to tax their lottery payments, the payments must be found to be from a business, trade, or profession carried on in Montana. Although the DOR contends that the lottery payments are income from the Sharps' occupation as lottery winners, the Sharps reply that they are not professional gamblers.

A general statement of legislative intent as to what income is subject to state taxation in Montana is provided at 15-30-102, MCA:

All income except what has been expressly exempted under the provisions of this chapter and income not permitted to be taxed under the constitution of this state or the constitution or laws of the United States shall be included and considered in determining the net income of the taxpayers within the provisions of this chapter.

No Montana statute or administrative rule has specifically defined lottery proceeds as income from intangible personal property or specifically exempted such winnings from state taxation. Further, when they receive their annual lottery payments, the Sharps are not receiving income from or interest on their prize; they are receiving the prize itself.

Given the absence of a specific exception of Montana lottery winnings from state taxation, and the above expression of the legislature's general intent, we conclude that support for the Sharps' position as to the rule on taxation of lottery prizes prior to 1992 is, at best, speculative.

In Couchot v. State Lottery Comm. (Ohio 1996), 659 N.E.2d 1225, cert. den. 117 S.Ct. 55, the Supreme Court of Ohio considered a challenge by nonresident lottery winners to Ohio state income tax assessments against their annual installment payments of lottery winnings. When Couchot redeemed his winning lottery ticket, Ohio law provided that lottery winnings of nonresidents were not subject to the Ohio income tax. Ohio statutes were subsequently amended to provide for taxation of lottery winnings of nonresidents. Stating that "the taxable event upon which [Ohio statute] levies a tax is the receipt of income," the Ohio court ruled:

Couchot's winning of the lottery in 1988 was not a closed transaction, wholly completed at that time. Accordingly, the application of [the Ohio statute as amended in 1989] to his subsequent receipt of installment winnings does not result in new obligations respecting transactions already completed, and, thus, no question of retroactivity is involved.

Couchot, 659 N.E.2d at 1231. The Ohio court ruled that taxation of Couchot's lottery payments received after the amendment of the statute was not unconstitutionally retroactive.

We agree with the reasoning in Couchot and conclude that the statutes in effect

at the time of each annual lottery payment control as to taxation of that payment. We hold that the Sharps' 1992 and subsequent lottery payments are not excluded from income under 15-30-105 and -131, MCA (1991). We further hold that Rule 42.16.1113(1), ARM, does not alter that determination. The fact that the administrative rule has not been amended since the statutes were amended does not overrule the statutory amendments. In fact, the opposite is true. The legislature has removed the language which appears in the rule from the statutes themselves. In Montana, a statute cannot be changed by administrative rule. See Bick v. State, Dept. of Justice (1986), 224 Mont. 455, 457, 730 P.2d 418, 420.

Thus, we return to the question of whether the Sharps' annual lottery payments are "income earned in Montana" pursuant to 15-30-105, MCA. The District Court considered four factors relevant when it determined that the Sharps' lottery winnings were earned in Montana: the location where the ticket was purchased, the location where the ticket was redeemed, the location where the first payment was received, and the location from which subsequent payments were mailed. In this case, all of these events undisputedly occurred in Montana.

The Sharps argue that these factors are completely irrelevant to the determination of the source of their lottery winning income. This argument is based in large part on their position that Montana statutes in 1992 did not justify the use of the test of contact counting, because the statutes did not attempt to tax income from intangibles for nonresidents. We have rejected that position above. Further, as pointed out by the District Court, the decision in Couchot and the opinion of the Court of Special Appeals of Maryland in Stark v. Comptroller (Md.App. 1989), 554 A.2d 458, support a conclusion that lottery winnings are earned in the state in which they were won. Couchot quoted the leading case of Harvester Co. v. Dept. of Taxation (1944), 322 U.S. 435, 64 S.Ct. 1060, 88 L.Ed. 1373. In Harvester, the Court affirmed the right of the State of Wisconsin to tax dividends received by out-of-state residents from corporate income derived from property located and business transacted within the state.

A state may tax such part of the income of a non-resident as is fairly attributable either to property located in the state or to events or transactions which, occurring there, are subject to state regulation and which are within the protection of the state and entitled to the numerous other benefits which it confers.

Harvester, 322 U.S. at 441-42. The Couchot court stated:

It is difficult to imagine a more fundamental exertion of a state's

taxing power than where the state taxes income on winnings from its
lottery.  The income received by Couchot in this case arose by virtue of his
participation in the Ohio lottery.  The Ohio lottery is an event exclusively
within the power, dominion, and control of Ohio.

Couchot, 659 N.E.2d at 1229.  The court went on to hold that taxation of
nonresidents'
lottery winnings did not violate due process.

The Sharps argue that their case is distinguishable from Couchot because the
multi-
state lottery is just that--a multi-state lottery.  However, the DOR points out that
it is the
Montana Lottery, not the MSLA, which bears the obligation to pay, and does pay, the
Sharps the annual payments of their lottery winnings.  The Montana Lottery is part
of the
state government of Montana.  See    23-7-101 through -412, MCA.  We conclude that
the Montana Lottery's participation in the multi-state lottery is inconsequential for
purposes of comparing this case with Couchot.

The Couchot court also addressed the issue of whether taxation of a
nonresident's
lottery winnings violated the Commerce Clause due to an insufficient nexus between
the
State of Ohio and the winnings.  The court reaffirmed the use of a physical-presence
requirement test in analyzing such an issue.  Stating that "the entire income
received by
Couchot, albeit paid over time in installments, is directly related to his physical
presence
in Ohio," the court found that the test was satisfied because Couchot purchased his
winning ticket and redeemed it in Ohio.  Couchot, 659 N.E.2d at 1230.

In Stark, the Court of Special Appeals of Maryland considered a case in which
Stark, a resident of the State of Washington, won $1,000,000 in the Maryland
lottery.
In the words of the court, "He is not complaining about that.  What irks him, and
has led
to this appeal, is the Comptroller's attempt to tax him on $950,000 of his
winnings."
Stark, 554 A.2d at 459.

Stark contended that only the first $50,000 payment on his lottery winnings was
subject to Maryland income tax.  He argued that his subsequent annual payments on the
prize were not income from the State lottery, but were instead income from an annuity
which the State of Maryland had admittedly purchased to pay lottery winners and which
was administered by a corporate entity in New Jersey.  The Stark court stated the
issue
as whether the periodic payments to Stark constituted taxable earnings from a state
lottery
prize.  After reviewing case law including Harvester and Couchot, the court held:

These cases make clear that a State may tax a nonresident not just on
income earned from property in the State or a business carried on in the
State but also from "events" or "transactions" occurring in the State, or
from intangible property having a special "localization" within the State.
The domicile of the recipient is not necessarily controlling.

Stark, 554 A.2d at 464.  The court determined that a sufficient nexus had been

established between the State of Maryland and Stark's annual payments on his lottery winnings to validate the state's taxation of the payments. The Stark court held that the state could tax the portion of winnings received after passage of the law authorizing taxation of State lottery winnings of nonresidents, even though those payments were made through the annuity purchased from a private corporation, because the payments were traceable to an event or transaction which occurred in Maryland. Stark, 554 A.2d at 464.

Finding Couchot and Stark persuasive, we agree with the District Court's determination that there is a sufficient connection between the State of Montana and the annual prize money the Montana Lottery pays to the Sharps to hold that the Sharps' lottery prize is "income earned in Montana."

The Sharps further object to application to this case of 15-30-246, MCA, a 1993 amendment to Montana income tax law. They assert that application of this statute to them is impermissibly retroactive and amounts to ex post facto legislation and that it violates their rights to due process. In the 1993 amendment, the Montana Legislature adopted the following statutory language:

It is the policy and intent of the legislature that lottery proceeds received by a person who redeems a ticket or chance to win a prize on a ticket or chance purchased in Montana under the provisions of Title 23, chapter 7, is Montana source income, notwithstanding the residence of the person or entity that redeems the ticket. This policy statement affirms that the legislature has always considered lottery proceeds to be Montana source income.

Section 15-30-246(1), MCA. The Sharps argue that this is a policy statement, not a tax statute, and therefore does not have the effect of law. They also point out that a legislature's attempt to declare the intention of a previous legislature is entitled to no weight. Section 15-30-246(2), MCA, further provides that lottery payments are subject to the state withholding tax. The Sharps contend that application of 15-30-246, MCA, to their case imposes retroactive tax liability upon them and violates Montana and federal constitutional guarantees of due process and equal protection.

The DOR's response is that the Montana income tax has always taxed the Montana Lottery winnings of nonresidents. In any event, the DOR argues that the taxable event is the receipt of income in a particular year; and, therefore, taxation of that income is not retroactive. The DOR further maintains that it is constitutional to tax some property or activities differently from other property or activities.

The District Court found it unnecessary to apply 15-30-246, MCA, in this case. The court instead based its ruling on the determination that the Sharps' lottery

payments
are "income earned in Montana" under  15-30-105, MCA.  We conclude that we need
not decide this issue, based on our conclusions above and because the District Court
did
not rely upon  15-30-246, MCA, in rendering its decision.

We hold that the District Court did not err in ruling that the Sharps' annual
lottery
payments are income earned in Montana from a state lottery prize.  As such, they are
subject to an income tax by the State of Montana.  We therefore affirm the decision
of
the District Court.

/S/  J. A.  TURNAGE

We concur:

/S/  WILLIAM E. HUNT, SR.

/S/  JIM REGNIER

/S/  W. WILLIAM LEAPHART

Justice James C. Nelson dissenting.


I dissent.  In summary, Sharps' lottery payments are income from an annuity and
from intangible personal property.  When Sharps became Washington residents in August
1992, Montana law provided that income received by a nonresident from intangible
personal property or from annuities was not subject to Montana state income tax
unless
earned in connection with a business, trade, profession, or occupation carried on in
Montana.  Since their lottery payments were not so earned, the Department of Revenue
(DOR) was and is without authority to subject Sharps' lottery payments to Montana
state
income tax. The 1992 amendments to the tax code did not change Montana's historic
income-sourcing rules.  Finally, under the majority's rationale, the State taxed and
is
taxing Sharps' property and income by an unconstitutional and unlawful retrospective
application of statutes enacted in 1992.

As the majority points out, no Montana statute or administrative rule
specifically
defines lottery proceeds as income from intangible personal property.  Nevertheless,
that
is  precisely the nature of the property that produces Sharps' income.  Intangible
property
þhas no intrinsic and marketable value, but is merely the representative or evidence
of
value, such as certificates of stock, bonds, promissory notes, copyrights, and
franchises.þ
Blackþs Law Dictionary 809 (6th ed. 1990).  Rather, an intangible is "a 'right' such
as
a patent, copyright, trademark, etc., or one which is lacking physical existence;
such as

goodwill." Black's Law Dictionary 809 (6th ed. 1990). These definitions are consistent with the notion of intangible property as used in the Montana Code. For example, 30-9-106, MCA, defines "general intangibles" as including þthings in actionþ; and 70-2-101, MCA, defines þa thing in actionþ as þa right to recover moneyþ.

Sharps' lottery income derives not from any real property or tangible personal property interest, but, rather, from their intangible right under the Montana State Lottery Act of 1985 (Title 23, Chapter 7, Montana Codes Annotated) to receive annual payments for purchasing a winning lottery ticket. Sharps maintain that this statutory right is actually a form of contract right since 23-7-311(5), MCA (right to prize not assignable but payable to estate or per judicial order) and 23-7-312, MCA (lottery winnings subject to Title IV-D child support lien) speak in typically contract terminology. They also argue, persuasively in my view, that their right to receive lottery proceeds is in the nature of another form of intangible property right, an annuity. An annuity is:

A right to receive fixed, periodic payment, either for life or for a term of years. [Citation omitted.] A fixed sum payable to a person at specified intervals for a specific period of time or for life.

. . .

The payment or receipt of a series of equal amounts of money per period for a specified amount of time.

Black's Law Dictionary 90 (6th ed.1990). Indeed, Multi-State Lottery Association Rule 30.1, effective in Montana under 23-7-202(8), MCA, specifically characterizes lottery payments as annuities payable in twenty equal installments. Moreover, the Internal Revenue Service treats lottery winnings as annuities for purposes of valuing a decedentþs estate under I.R.C. 7520. See Tech. Adv. Mem. 96-37-006 (May 10, 1996), 1996 WL 518910.

Accordingly, whether viewed in terms of a contractual or statutory right or as the right to receive annuity payments, income from winning a lottery prize clearly derives, not from any real property or tangible personal property interest, but from a thing in action or from intangible personal property.

Recognition of this legal principle is fundamental to a correct analysis of the issue presented in this case because since 1933 Montana has taxed nonresidents only on that portion of their income from annuities and from intangible personal property that is derived from sources within Montana. Under 15-30-131(1), MCA (1991), a nonresident's income from intangible personal property is derived from or attributable to sources within Montana only to the extent the intangible property was employed in a

business, trade, profession, or occupation carried on in this State. Specifically, this section of the tax code provides:

In the case of a taxpayer other than a resident of this state, adjusted gross income includes the entire amount of adjusted gross income from sources within this state but shall not include income from annuities, interest on bank deposits, interest on bonds, notes, or other interest-bearing obligations, or dividends on stock of corporations except to the extent to which the same shall be a part of income from any business, trade, profession, or occupation carried on in this state. Interest income from installment sales of real or tangible commercial or business property located in Montana must be included in adjusted gross income. Adjusted gross income from sources within and without this state shall be allocated and apportioned under rules prescribed by the department.

Section 15-30-131(1), MCA (1991) (emphasis added).

Similarly, DOR's administrative rule, 42.16.1113, ARM, provides that a nonresident's income from intangible personal property is not "sourced" within this state unless earned in connection with a business, trade, profession or occupation carried on in Montana. Specifically,

(1) A nonresident's income from annuities; interest on bank deposits, notes, and other interest bearing obligations; dividends on capital stock of corporations, royalties from patents and copyrights; and all other income from intangible personal property is derived from or attributable to Montana sources only to the extent earned in connection with a business, trade, profession, or occupation carried on in Montana.

(2) Income from intangible personal property is earned in connection with a business, trade, profession, or occupation carried on in this state if the intangible personal property is employed as capital in this state or if the possession and control of the property has been localized in connection with the business, trade, or occupation carried on in this state so as to become an asset thereof.

(3) Interest income received by a nonresident on an installment transaction arising from the sale of real or tangible business property located in Montana shall be deemed to be income from sources within Montana, unless the item is properly excludable from federal gross income.

Section 42.16.1113, ARM (emphasis added).

In 1992 a special legislative session adopted certain amendments to Title 15, Chapter 30, Montana Code Annotated. These amendments became effective August 6, 1992. Section 9, Ch. 14, L., 1992. Section 15-30-131, MCA, was amended to read: þIn the case of a taxpayer other than a resident of this state, adjusted gross income includes the entire amount of adjusted gross income as provided for in 15-30-111.þ Section 15-30-111, MCA, was not amended. It provides that adjusted gross income is an individual's federal adjusted gross income. Under 15-30-105, MCA (1992), a tax is imposed on the entire net income of nonresidents. However, after calculating the tax imposed, the tax due and payable is determined based upon the ratio of "income earned in Montana" to total income. Section 15-30-105(1), MCA (1992).

While the phrase "income earned in Montana" is not defined, there is, nevertheless, nothing about these 1992 amendments to indicate that "income earned in Montana" was intended to have any different meaning than "income from sources within Montana" as used in the pre-1992 statutes. A close examination of these amendments leads to this conclusion.

First, the title of Chapter 14 of the 1992 Laws of Montana, "An Act Revising the Method of Calculating the Individual Income Taxes Due From Nonresident and Temporary Resident Taxpayers . . .", supports the conclusion that the amendments were enacted to change the method of income tax calculation or income tax rate, as opposed to effecting a change in the decades-old source of income rules.

Second, harmonizing the phrase "income earned in Montana" in 15-30-105, MCA (1992), with another section of the tax code pertaining to nonresident taxation, 15-30-142(1), MCA, reveals that this phrase has the same meaning as "income from sources within Montana." Section 15-30-142(1), MCA, sets out the amount of income a nonresident must have before being required to file a tax return. This section was also amended by Chapter 14, but, here, the legislature retained the reference to income sources within Montana. Specifically, the nonresident must file a return if his gross income for the tax year derived from "sources within Montana" exceeds the amount of personal exemptions. Section 15-30-142(1), MCA (1992). Only if a nonresident has a certain threshold income from "sources within Montana" must he file a return under 15-30-142(1), MCA, and proceed to calculate the amount of tax due and payable based upon the ratio of "income earned in Montana" to total income under 15-30-105, MCA. Thus, its use of similar language in 15-30-105 and 142(1), to describe the same thing--income earned in or from sources within Montana-- is clear evidence of the legislature's intention to retain the traditional source of income rules which had been in effect for nearly 60 years prior to the 1992 amendments. In fact, as Sharps point out, a different construction leads to the absurd result that a person without a filing obligation under 15-30-142 could nonetheless have a tax liability under 15-30-105.

Third, the history of the 1992 amendments to Title 15, Chapter 30 of the Montana Code Annotated, is devoid of any evidence that the legislature intended to change the historic source of income rules. Rather, the proceedings behind the adoption of Chapter 14, clearly indicate that even DOR understood that the amendments were passed to correct a tax calculation problem in the pre-1992 statutes that caused residents and nonresidents to fall under disparate and divergent tax brackets. See Bostick v. Department of Revenue (Mont. Tax App. Bd. March 17, 1995), 1995 WL 147895 (summarizing the legislative history of the 1992 amendments).

Finally, DOR's administrative rule, 42.16.1113, ARM, cited above, remains in effect even today. As the majority acknowledges, this rule has not been amended since 1983. Obviously, had the legislature actually changed the source of income rules in the

1992 amendments, DOR, being no doubt mindful of Bick v. State, Dept. of Justice (1986), 224 Mont. 455, 730 P.2d 418, would have, likewise, amended this rule years ago and the agency would have adopted some test other than traditional income sourcing. Not only has it not done so, but DOR's instructions to taxpayers on the 1992 Montana Income Tax Return booklet--the very year that the source of income rules apparently were done away with--and such instructions in each year since, have advised taxpayers that "[i]ntangible income, not related to a Montana business, is nontaxable." Clearly, the nonresident income-sourcing rules of the pre-1992 tax code were not changed by the 1992 legislative amendments. Importantly, even DOR believed that to be the case and apparently still does.

Sharps are absolutely correct in their assertion that where their lottery ticket was purchased and redeemed; where their first payment was received; and the location from which subsequent payments were mailed, are wholly irrelevant to the statutory interpretation issue which is at the heart of the matter before this Court. Neither the pre-1992 nor the 1992 statutory scheme had anything whatsoever to do with "contact" counting, as the majority puts it. The legislature had for decades opted to tax nonresidents on income from intangible property and annuities under a carefully crafted and very specific sourcing test; the 1992 amendments did not change that. To now interpret these clear and unambiguous statutory criteria by counting "contacts" which are not part of the statute, makes about as much sense as the blind man trying to describe the elephant's trunk by reference to a tree.

There is no legal justification or basis in Montana law for the majority's contact-counting approach adopted in this case. Montana's statutes provide the appropriate basis for analysis and that basis involves application of well-established income-sourcing rules.

The obvious error of our disregarding these well-established rules and in adopting contact counting is demonstrated by a simple example. If I, as a Montana resident, purchased General Motors stock in 1991 at a brokerage house in Billings and received the first dividend payment while residing in that city, future dividends will now be subject to Montana income tax notwithstanding that I became a Washington resident in 1992. I cannot believe that the 1992 Legislature envisioned such an absurd result or that DOR ever anticipated such a financial windfall when the 1992 amendments were enacted.

Furthermore, I do not agree with the majority that the reasoning of Couchot v. State Lottery Comm. (Ohio 1996), 659 N.E.2d 1225, International Harvester Co. v. Wisconsin Dept. of Taxation (1944), 322 U.S. 435, 64 S.Ct. 1060, 88 L.Ed. 1373, or Stark v. Comptroller (Md.Ct.Spec.App. 1989), 554 A.2d 458 support its decision. In the first place, these cases did not address the sort of statutory scheme that was in

effect in
Montana during 1991 and 1992--a statutory scheme which did not allow for the taxation of income from annuities and from intangible personal property of nonresidents unless that income was derived from sources within Montana.  The 1992 amendments did not change that scheme. Since the court in Couchot addressed only the effect of statutes that were subsequently amended to specifically provide for taxation of nonresident lottery winnings, the case is not on point.

As to International Harvester, the property of Sharps being taxed--i.e., their annuity income and their income from intangible personal property--was not located in and was not  sourced within Montana after 1991 under this State's statutory scheme. Accordingly, the rule cited with approval by the majority is inapplicable.

Finally, as to Stark, the opinion addresses only those payments which the taxpayer received after the adoption of statutory amendments expressly imposing a tax on the nonresident winners of the state lottery.  Again, as with Couchot and International Harvester, the case is inapplicable. The 1992 amendments to Montana's law did not effect any change from the 1991 law which, clearly, did not tax nonresident annuity and intangible property income except to the extent such income was sourced in this State under the business, trade, occupation or profession test.

To summarize then, after Sharps became residents of Washington in August 1992, under Montana law then in effect, the income from their lottery payments, being income from an annuity and from intangible personal property, was subject to Montana income tax only to the extent such payments were earned in connection with a business, trade, profession or occupation carried on in Montana.  Since their lottery payments received after August 1992--i.e., the December 1992 and subsequent payments--were undisputedly not so earned and were, thus, not sourced within this State, Montana was and is without authority to tax such payments.  The 1992 amendments to the tax code did not change these  historic income- sourcing rules.

This brings us to the second error of the majority's decision in the case at bar.

Assume, for purposes of this discussion only, that the 1992 special session did intend and did effect the fundamental change in the nonresident income-sourcing rules that the majority seems to believe resulted from the 1992 amendments.  Because such amend- ments were not effective until August 6, 1992, and expressly apply only to tax years after December 1991 (  9 & 10, Ch.14, L. 1992), Sharps' December 1992 and subsequent years' lottery payments were not, using the majority's contact-counting approach, "earned in Montana" under  15-30-105, MCA (1992).  Furthermore, any attempt to apply such amendments to the 1991 contact events on which the majority relies as constituting Sharps' "earning" of their lottery income violates Montana's constitutional prohibition against retrospective legislation found at  Article XIII, Section 1(3), which provides: þThe legislature shall pass no law retrospective in its operations which imposes on the

people
a new liability in respect to transactions or considerations already passed.þ

Finally, while the majority judiciously chooses to avoid addressing the host of legal
and federal and state constitutional infirmities inherent in  15-30-246, MCA (1993), the
passage of this legislation begs an obvious question, the equally obvious answer to which
further highlights the underlying error of the majority's opinion. If the intent of the 1992
special session and the effect of the 1992 amendments were in truth as clear as DOR and
the majority now proclaim them to be--i.e., if the source-of-income rules were, in fact,
done away with by the 1992 amendments--why, then, would the legislature, less than a year later, find it necessary to affirm that it had þalways considered lottery proceeds to
be Montana source income"?   Section 15-30-246, MCA (1993). The answer, of course, is that the legislature had not always considered lottery payments to be Montana source
income and that this gaping hole in the tax code was discovered only after the 1992 amendments went into effect--most likely by DOR when Sharps filed their 1992 income tax return.  To paraphrase the quote from Stark cited by the majority, DOR was not complaining that Sharps won the lottery; what irked the agency was that Montana law didn't allow the State to tax Sharps' good fortune.

On the undisputed facts here and on what I believe is the correct interpretation of
the applicable law, I would hold that Sharps' lottery payments were not and are not subject to Montana state income tax subsequent to their change of residence to Washington in August 1992. Moreover, I conclude that under the contact-counting approach adopted by the majority here, the 1992 amendments to the tax code are being unlawfully and unconstitutionally applied retrospectively to the Sharps.  I would reverse,
and I dissent from our failure to do so.

/S/  JAMES C. NELSON


Justices Karla M. Gray and Terry N. Trieweiler concur in the foregoing dissent.


/S/  KARLA M. GRAY


/S/  TERRY N. TRIEWEILER